**In re DAKOTA LAY'D EGGS, a/k/a Dakota Crackin', Inc., Debtor.**

**Bankruptcy No. 85–05756.**

United States Bankruptcy Court,
D. North Dakota.

Feb. 7, 1986.

Daniel Wentz, Fargo, N.D., for petitioning creditors.

James A. Rubenstein, Minneapolis, Minn., Jay Carlson, Fargo, N.D., for debtor.

## MEMORANDUM OPINION
## AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

On December 5, 1985, an Involuntary Petition was filed by Master Feeds, Inc.; Thunderbird Ranch, Inc.; M & H Farms,

Inc.; David Rock; and Purina Mills, Inc. requesting that the Court order Chapter 7 relief against the alleged Debtor, Dakota Crackin', Inc. In its Answer, Dakota Crackin' denies the nature and amount of the Petitioners' claims as well as the allegation that it is generally not paying its debts as they come due. Its principal defense, however, is that Dakota Crackin', Inc. is a "farmer" against whom an involuntary case may not be commenced. Dakota Crackin', Inc. seeks dismissal of the Petition and has counterclaimed for costs, attorney fees, actual and punitive damages as provided by section 303(i).

A trial was held on January 22, 1985. The facts as material may be summarized as follows:

### FINDINGS OF FACT

1.

Dakota Crackin', Inc. (DCI) is a corporation incorporated under the laws of North Dakota in January 1984. Its stated purpose as provided in the Articles of Incorporation is to process fresh eggs into dried, frozen and liquid egg products as well as any other purposes allowed under the North Dakota Business Corporation Act. The company is not registered in North Dakota as a farm or ranch corporation and has never filed annual reports as a farm or ranch corporation. It does, however, file federal employment tax returns as an agricultural rather than commercial business. DCI's stated purpose is not descriptive of the true nature of its business operation and, because the nature of the operation is at the heart of DCI's defense, it will be discussed in some detail. DCI markets eggs under the trade name, Dakota Lay'd Eggs, both in the United States and Canada. Eggs are obtained from four sources:

a) *DCI-owned flock and production facility:* DCI owns three egg production barns located in Cando, North Dakota, and Bismarck, North Dakota. At these three facilities, the company owns the hen flocks as well as the physical buildings and equipment and is responsible for all costs of production. The eggs produced at these three facilities are graded, washed, candled and packaged by DCI's employees.

b) *DCI-owned flock:* DCI entered into contracts termed "Commercial Market Egg Agreement" with farmers (denoted in the contracts as "producers") whereby DCI provided the hens with the farmer/producer responsible for providing all necessary production facilities, including shelter, labor and other items necessary to maintaining the chickens and producing eggs with the exception of feed and medication which were provided by DCI. The contract further provides that DCI will provide management advice and, if necessary, assume production control if the producer, due to death, incapacity or neglect, fails to properly maintain the chickens. The farmer is paid a fixed sum for all eggs produced. The eggs thus produced are picked up by DCI and taken to their Cando facility where they are graded, candled, washed and packaged.

c) *Farmer-owned flock and facility:* DCI entered into contracts called "Egg Production Contract" with farmers (denoted in the contract as "producer") for the purchase of eggs laid by hens owned by the farmer and produced in facilities owned and operated by the farmer. In those contracts, it is specifically provided that the farmer/producer is an independent contractor and is not an agent, employee or partner of DCI. In these cases, DCI also provided feed and medication. The contract allows DCI to assume control of the operation in the event of the producer's death or incapacity. The farmer is paid according to eggs produced, and the eggs thus produced are taken by DCI to its Cando facility and there candled, weighed, graded and packaged in cartons.

d) *Open market:* DCI purchases eggs on the open or "spot" market from producers who were not under contract to it and who operated wholly independent production facilities. This is done only on occasion when necessary to meet egg supply contracts. These eggs are also candled,

weighed, graded and put in cartons at DCI's facility.

DCI provides feed to the contract farmers via an indirect method. The quality of an egg depends largely upon the type and quantity of feed, and quality was important to DCI such that it required a particular type of feed base to be used by the contract farmers. DCI purchases base feed in bulk quantity. Master Feeds, Inc., a feed manufacturer, picks up the base feed from DCI and mixes it at their plant with the balance of the feed ration provided by Master. Master then delivers the mixed feed supply to the contract farmers.

DCI has never made powdered, dried, frozen or liquid egg products. The only product coming out of its egg operation are raw eggs of the kind one normally sees in grocery store egg cartons.

Al Riches, DCI's President, acknowledged there to be a difference between an egg producer and an egg processor in that a processor owns no chickens himself but instead buys eggs from other persons. While not typical, it is not unheard of in the egg industry for egg producers to maintain their own facilities for candling, grading, washing and packaging. Lance Mandt, a chicken farmer and an officer of several of the petitioning creditors, opined that the character of an egg producer changes to that of an integrated processor if the producer maintains his own facility for the washing, candling, grading and packaging of eggs. He acknowledged, though, that the closer an egg producer is to a processor the better; and if a producer is big enough, it would be best to have the processing facility in-house.

In addition to income derived from egg sales, DCI in the fiscal year 1984–1985 had income from several other sources. In early 1985, it purchased a company known as Myhro Layer Farms and Feed Co. and acquired that company's feed plant and trucks. 90% of the feed company's production is used by DCI in its own operation, but some portion of feed production is sold on the open market. Rather than deadheading an egg transport truck, DCI on occasion back-hauls loads for other people and in this fashion also derives income. DCI, with regards to flocks it owned, retained salvage value; and in 1984–85, it had income from the sale of old hens. DCI also sold a small quantity of its eggs door-to-door.

2.

The company's total gross income from all sources for the fiscal year March 30, 1984 to March 29, 1985 was $3,000,803.00.

The egg production breakdown from all production sources, including the percentage each source represents to total egg sales, is as follows:

| | | |
|---|---|---|
| DCI-owned flock and facility | 116,373 cases | 59.82% |
| DCI-owned flock | 22,292 cases | 11.46% |
| Farmer-owned flock and facility | 19,028 cases | 9.78% |
| Open market | 36,830 cases | 18.93% |
| (A "case" is 30 dozen eggs) | | |

The income breakdown, including percentage breakdown from all sources, is as follows:

| | | |
|---|---|---|
| DCI-owned flock and facility | $1,693,197.98 | 56.42% |
| DCI-owned flock | $ 324,345.08 | 10.8% |
| Farmer-owned flock and facility | $ 276,853.30 | 9.2% |
| Open market | $ 535,867.47 | 17.86% |
| Door-to-door sales | $ 2,576.00 | .08% |
| Feed sales | $ 96,759.00 | 3.22% |
| Trucking | $ 9,810.00 | .33% |
| Hen sales | $ 52,493.00 | 1.75% |
| Miscellaneous | $ 8,904.00 | .3% |

3.

DCI has never, during its existence, been financially successful. For the 14 months ending May 31, 1985, the company had a negative net worth of $738,527.00 and a net loss for the same period of $1,960,182.00. For the year 1985 to November 8, 1985, DCI experienced an operating loss of $495,-485.00 and a negative net worth of $1,560,-427.00. For the four-week period ending November 8, 1985, it had an operating loss of $54,000.00.

**652**

DCI's total accounts payable as of December 30, 1985, was $462,074.20. Of this sum, $312,703.00 is 90 days past due; $12,379.00 is 60 days past due; $28,200.00 is 30 days past due; and $108,790.00 was current as of December 30. The sums due the petitioning creditors may be summarized as follows:

| | | |
|---|---|---|
| Master Feeds, Inc. | $ 8,782.00 | 90 days past due |
| Thunderbird Ranch, Inc. | $26,484.00 | 90 days past due |
| M & H Farms, Inc. | $ 1,976.00 | 90 days past due |
| David Rock | $ 3,371.40 | 90 days past due |
| Purina Mills | $ 5,656.00 | 90 days past due |

No evidence was presented suggesting these figures are not accurate or that the petitioning creditors' claims and the claims generally are in any way contingent or disputed.

## CONCLUSIONS OF LAW

### 1.

Section 303(a) of the Bankruptcy Code prohibits an involuntary Chapter 7 case from being commenced against a farmer. The term "farmer" is defined in section 101(17) of the Code as:

[A] person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person.

11 U.S.C. § 101(17). The term "farming operation" is defined in section 101(18), to wit:

"[F]arming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.

11 U.S.C. § 101(18). This is the focus of our initial inquiry. DCI, pointing to the nature of its business, argues that its sole business is the hen and egg business with more than 80% of its income derived from a farming operation owned or operated by it. The petitioning creditors argue that a distinction must be made between true farming activities and non-typical operations and that if this distinction is made, the Debtor fails to qualify as a "farmer" under section 101(17). The creditors take the position that the only income sources that can be included as derived from a farming operation are: DCI-owned flock and facility; DCI-owned flock; door-to-door sales; hen sales; and a portion of the miscellaneous income items. When the gross income from these five sources are added together, they represent only 69% of total gross income. DCI believes that the definition of "farming operation" set out in section 101(18) is non-exclusive of those activities which might qualify as "farming operations" and that given a broad construction, the term should include all of the income sources because all of them were farm-related activities or at least ancillary and incidental to farming activities.

Section 101(18) is a relatively recent addition to the Code, being first introduced as a part of the Bankruptcy Reform Act of 1978. Its purpose was to aid in the definition of "farmer" set out in section 101(17). Although the term "farmer" had been previously defined in the Bankruptcy Act, its present definition as now found in section 101(17) of the Code is also a product of the Bankruptcy Reform Act of 1978. The term was first defined in the 1938 Revisions to the Bankruptcy Act of 1898 which was codified as 11 U.S.C. § 1(17) of the former Act. Section 1(17) defined "farmer" thusly:

Farmer shall mean an individual personally engaged in farming or tillage of the soil, and shall include an individual personally engaged in dairy farming or in the production of poultry, livestock, or poultry or livestock products in their unmanufactured state, if the principal part of his income is derived from any one or more of such operations.

11 U.S.C. § 1(17). The reason for the 1938 definition was to extend the meaning of farmer to "persons engaged chiefly in farming or the tillage of the soil". H.Rep. No. 1409, 75th Cong., 1st Sess., p. 6. It

should at this juncture be noted that many of the section 1(17) definitions of farmer found their way into the later Code definition of "farming operation". Language such as "tillage of the soil", "dairy farming", and "production of poultry or livestock products in their unmanufactured state" are retained as definitive of a "farming operation" under section 101(18) of the present Code.

■ The legislative history pertaining to the passage of the section 101(17) Code definition suggests that the definition was derived from the Small Business Act and was meant by its framers to encompass only small farmers rather than agri business. H.Rep. No. 95–595, 95th Cong., 1st Sess., 311 (1977), U.S.Code Cong. & Admin. News 1978, p. 6268. The case of *In re Blanton Smith Corp.*, 7 B.R. 410 (Bankr. M.D.Tenn.1980), is one of the few bankruptcy cases construing the application of section 101(17) and section 101(18). The issue in that case is whether the character of the debtor's business was such that it could be included within the definition of "farmer". In that case, the debtor's entire income was derived from the processing, packaging and marketing of eggs from hens owned by the debtors and cared for by others or from hens owned and raised in facilities owned by the debtor. Creditors in *Blanton Smith*, as here, characterized the debtor as a corporate agri-business whose income was derived from commercial operations rather than from a farming operation. Tracking the legislative history of sections 101(17) and (18), as well as the definition of "person" found in section 101(33), the bankruptcy court in *Blanton Smith* concluded that the term "farmer" could no longer be confined to small farms but rather must include in its definition farming corporations and agri business. With that conclusion, this Bankruptcy Court agrees. The *Blanton Smith* case, however, did not address the issue from the standpoint of income or production sources. It did not attempt to distinguish between debtor-owned or operated farming operations and non-owned or non-operated farming operations. Nor did it discuss the

meaning of the language of section 101(18) beyond saying it should be given a broad interpretation. The *Blanton Smith* court was able to avoid those issues perhaps because in that case the debtor's income was totally derived from poultry owned by the debtor which may have suggested to the court that the debtor at least owned, if not operated, the farming operation.

■ Regardless of how expansive an interpretation one wishes to give section 101(18), the requirements of section 101(17) cannot be ignored. Irrespective of whether farming corporations and agri-business enterprises are included within the term "person", such entity still must meet the specific requirements of section 101(17) in order to have the section 303(a) farmer exemption apply. That is to say, at least 80% of the entity's gross income must be from a "farming operation" owned or operated by the entity.

In construing section 101(18), several things must be kept in mind. First, section 101(18) is a helper. Its placement in the Code is intended to aid in defining who qualifies as a "farmer" under section 101(17). Secondly, although section 101(18) may by its terms be regarded as non-exclusive with regards to the types of farming operations which may be included within the definition, it cannot be so broadly applied as to bring in operations clearly outside the nature or practices one normally associates with farming.

■ If the term "farming operation" as used in section 101(17) were intended by Congress to have no definitional parameters, then Congress would not have bothered, via section 101(18), to provide by example those types of operations which the term was meant to include. Section 101(18) suggests that the term "farming operation" was meant to include those activities normally done by persons engaged in the initial stages of production. Cases interpreting the term "farming operation" bear this out. There is a paucity of bankruptcy cases dealing with the meaning of "farming operation" as used in section 101(18).

The case of *Matter of Beery,* 680 F.2d 705 (10th Cir.1982) decided under 11 U.S.C. § 1(17) of the Act, concluded that to be a "farmer", one had to have been personally engaged in the farming activity. Section 101(17) of the Code has expanded on this, suggesting that the farming activity (now termed "farming operation") need not be personally operated by the entity but is included if the operation is owned by it. The Code has retained distinctions between farming operations and non-farming operations and has also retained the distinction between farming operations owned or operated by the entity and farming operations neither owned nor operated by the entity. In a comparatively recent decision, the United States District Court for the Central District of Illinois upheld a bankruptcy court's determination excluding income derived from the sale of farm machinery and income derived from the rental of farmland. The bankruptcy court, interpreting section 101(18), distinguished between income derived from tillage or production itself and income from equipment that tills and produces. It also distinguished income from the rental of farmland because the receipt of rent up front without taking part in the inherent risks of farming was not enough in the view of the court to come within the "owned or operated" requirement. The District Court construed section 101(17) as affording protection only to persons whose income is derived from operations that are subject to climate, farm price fluctuation, and uncertain crop production. *Armstrong v. Corn Belt Bank,* 55 B.R. 755 (Bankr.C.D.Ill.1985). The *Armstrong* decision, being the most recent decision expressly dealing with the term "farming operation" in the context of section 101(18), does suggest that within the field of bankruptcy law a distinction must be made between the nature or character of the income sources in order to arrive at a determination of what constitutes a "farming operation". Although there are few relevant bankruptcy cases interpreting the term "farming operation", in matters of statutory construction, it is appropriate to consider other statutes employing similar

terms even though the statute referred to is not strictly in pari materia. 73 Am. Jur.2d, Statutes § 186. Research discloses other federal statutes which have used the term "farming operation", and clear parallels in term definition may be seen in those cases decided in other fields of law. The logic of these decisions is helpful in analyzing the character of DCI's operation as fitting within the definition of "farming operations".

The Supreme Court case of *Bayside Enterprises, Inc. v. NLRB,* 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977), turned on the issue of whether persons employed by three large integrated poultry producers were agricultural laborers and for that reason not subject to the National Labor Relations Act (29 U.S.C. § 152(3)). Under the Act, agricultural employees as defined by section 3(f) of the Fair Labor Standards Act were excluded from protections of the NLRA. As relevant, 29 U.S.C. § 203(f) of the Fair Labor Standards Act provides:

> "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities ... the raising of livestock, bees, fur-bearing animals, or poultry, and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f). The Supreme Court addressed the issue by reflecting on the character of the company's business. The business consisted of the raising of chickens on farms owned and operated by independent farmers who, pursuant to contract, were provided chicks, feed and medicine by Bayside. Bayside retained title to the chicks and paid the farmers a guaranteed sum based on production. Bayside also operated a feed mill from which feed was shipped to the independent farmers. The Supreme Court, in affirming the decision of

the NLRB, let stand the Board's position that "when an employer contracts with independent growers for the care and feeding of the employer's chicks, the employer's status as a farmer engaged in raising poultry ends with respect to those chicks" (citing *Imco Poultry*, 202 NLRB 259–260 (1973)).

In the case of *Calaf v. Gonzalez*, 127 F.2d 934 (1st Cir.1942), decided under the Fair Labor Standards Act of 1938 (29 U.S.C. § 213(a)(6)), providing for an agricultural exception similar to that found in 29 U.S.C. § 203(f), the court considered whether a sugar mill owned by a sugar cane producer was a farming operation or incidental to farming. The court, on this point, said "there is no rational basis for saying that simply because the ownership of the mill and farms is in the same hands that therefore those employees who are engaged in an activity separate and distinct from agriculture are exempt from the provisions of the Act."

■ Circumstances of production similar to those now under consideration in the case at bar were evident in the Fifth Circuit case of *Mitchell v. Huntsville Wholesale Nurseries, Inc.*, 267 F.2d 286 (5th Cir.1959). Although decided under the Fair Labor Standards Act, the facts of that case as well as the court's conclusion are worthy of comment. Huntsville was a large wholesaler of nursery products. It owned a farm where approximately two-thirds of its stock was grown. It also obtained nursery products from other growers including rose bushes which comprised 17–20% of annual sales. The rose bushes were grown on a contract basis by farmers who leased the land to Huntsville for $20.00 per acre. Labor was provided for by the independent farmer. The court, relying on section 203(f) of the Fair Labor Standards Act, said that to be included as a farming operation, the practices in question *must relate to the farmer's own operations and not to the farming operations of others*. Urged to adopt a broad interpretation of farming operation, the Fifth Circuit said, "it is not a question of giving the statute a broad or narrow interpretation but rather considering the facts and determining whether what is claimed by Huntsville to be its own farming is in reality the farming of others." The court continued, "to permit this sort of arrangement to be called farming ... would be not to give a broad construction to the statutory exception but to do away with it altogether and to substitute for it a rule that anything that aids farming such as furnishing a steady market, certain outlets, general aid and assistance to the farmer, is within the exception". 267 F.2d at 291. DCI would urge upon this Bankruptcy Court the same expansive definition of "farming operation" in the context of section 101(18) of the Bankruptcy Code as was urged upon the Fifth Circuit in the context of section 203(f) of the Fair Labor Standards Act. DCI urges that "farming operation" denotes an overall business enterprise in which farming is accomplished, as opposed to particular farming functions or activities. This position is fostered in view of what DCI believes to be the modern realities of farming—a complex integrated business. This Court cannot ascribe such an unfettered definition to "farming operation" as DCI would wish. To do so would, in the view of this Court, be tantamount to eliminating the definition altogether and would bring within its scope any integrated agri-business enterprise irrespective of the intimacy of its ties to the actual conduct of farming as that term has been defined both by section 101(18) and former section 1(17) of the Bankruptcy Act. If there is to be no distinction between farming operations and non-farming operations, then, as the petitioning creditors argue, perhaps even companies like Cargill or Continental Grain could come within the purview of "farmer". No court addressing a similar definition of "farmer" or "farming operation" has been willing to accord it so broad a definition. The Supreme Court considered the distinction between producers and processors in context of the Capper-Volstad Act (7 U.S.C. § 291) in the case of *National Broiler Marketing Assn. v. U.S.*, 436 U.S. 816, 98 S.Ct. 2122, 56 L.Ed.2d 728 (1978). Section 291 protects

farmers from the anti-trust laws, defining the persons protected as "[p]ersons engaged in the production of agricultural products *as farmers, planters, ranchmen, dairymen, nut or fruit growers."* The National Broiler Marketing Assn. was a marketing cooperative consisting of integrated producers and wholesalers of chickens, many of whom owned and operated processing plants and all of whom contracted with independent farmers for at least a portion of their chickens. The Supreme Court, in construing section 291, said that the language of the statute outlined above ("... as farmers, planters, ranchmen, dairymen, nut or fruit growers") operated to restrict the broader preceding language. Disregardingg the co-op's economic argument, which was similar to that now being made by DCI, the Supreme Court concluded that a co-op member who neither owns a flock nor a hatchery and that maintains no grow-out facility were not farmers as the term is used in the Act. Applying similar statutory construction to section 101(18) of the Bankruptcy Code would require that the otherwise expansive definition which might be given to "farming operation" is restricted or at least given definitional parameters by the effect of the exemplifying language.

■ From the foregoing discussion, this Court concludes that an agri-business enterprise is not per se a person who derives its income from a farming operation. Rather, the determination must be made by considering the character of the business and whether its income is derived from its own farming or production efforts as opposed to the farming or production efforts of others. The rationale of the Fifth Circuit in *Mitchell* best expresses the distinction which this Court feels is appropriate in determination of the character of an agri-business. Is it a typical farming activity and, if so, whose farming activity is it— DCI's or someone elses?

■ Looking at the facts of the instant case, the Court concludes that income derived from flocks owned and maintained in facilities operated by DCI come within the traditional meaning of farming operation and being both owned and operated is included within the section 101(17) percentage tabulation. Income from flocks owned by DCI but managed by others is also within the definition of poultry production and, since the hens are owned by DCI, should also be included in the tabulation. Income derived from hen sales and door-to-door egg sales ought to be included because it is reasonable to assume that it stems from DCI's own production. Income from eggs obtained through contracts with independent farmer/producers who owned the hens is not income derived from a farming operation owned or operated by DCI and is thus excluded from the tabulation. Similarly, income from eggs obtained on the open market is derived from a product of a farmer other than DCI and is excluded. Income derived from the sale of feed is not a product of crop production or animal husbandry and is not within the definition of "farming operation". It is excluded. Income from trucking is not a result of any form of planting or husbandry and is likewise excluded. Miscellaneous items of income comprising .3% of total gross income will be included because from the facts the miscellaneous items of income seem to be derived from sources inherently incidental to a farming operation owned or operated by DCI itself.

Differentiation of the source of DCI's income in the foregoing fashion indicates that 69.68% of gross income for the 1984–85 taxable year was derived from a farming operation owned or operated by DCI. Accordingly, DCI has failed to meet the specifically mandated percentage requirement of section 101(17) and, for purposes of section 303(a), is not a farmer. It may be placed in involuntary Chapter 7 providing the remaining elements of section 303 are met.

2.

Having concluded that DCI is subject to an involuntary petition, we must now address whether the three-creditor requirement of section 303(b) has been met. The petition must have been filed by at least

three creditors, each of whom is holder of a claim that is not contingent as to liability or the subject of a bona fide dispute and whose claims aggregate $5,000.00 more than the value of any lien or property securing such claims. 11 U.S.C. § 303(b)(1). This threshhold test has been met. It is uncontested that the three petitioning unsecured creditors are the holders of noncontingent, nondisputed claims totalling $46,-269.00 as of the date of the petition.

■ The next inquiry is whether DCI is generally not paying its debts as they come due. 11 U.S.C. § 303(h)(1). Courts have been unable to arrive at a uniform standard for determining what constitutes a failure to pay debts generally. A starting point in the inquiry is to employ what is termed the mechanical test which is comprised of five factors: the timeliness of payments on past due obligations; the amount of debts long overdue; the length of time during which the debtor has been unable to meet large debts; any reduction in the debtor's assets; and the debtor's deficit financial situation. *See In re Gill Enterprises, Inc.*, 15 B.R. 328, 332 (Bankr. D.N.J.1981). Although offering guidance, the mechanical test must be employed with regard to any unique circumstances attendant to a particular proceeding. *In re Midwest Processing Co.*, 41 B.R. 90 (Bankr.N. D.1984); *In re All Media Properties, Inc.*, 5 B.R. 126 (Bankr.S.D.Tex.1980). Although DCI's President stated on direct examination that the company was generally paying its expenses, he acknowledged on cross-examination that his reference was only as to weekly expenses, not to past due billings. He conceded that the company has never been profitable and is insolvent by $1.5 million. The facts indeed suggest that DCI is in extremely difficult, if not impossible, financial straits. Only in existence since January 1984, DCI now has a negative net worth of $1,560,427.00 and accounts payable of $462,074.20. It is unable to maintain its accounts in current status, the bulk of which are 90 days past due. There was no evidence presented suggesting any conclusion but that DCI is unable to generally pay its debts as they come due. From a totality of the financial data available, the Court concludes that this final element has been met.

Accordingly, and for the reasons stated, Dakota Crackin', Inc. is subject to an involuntary proceeding, and the Court will enter an order for relief pursuant to Chapter 7 of the Bankruptcy Code.

IT IS SO ORDERED.