**In re Leslie J. McKILLIPS and Patricia McKillips, Debtors.**

**Bankruptcy No. 86 B 21676.**

United States Bankruptcy Court, N.D. Illinois, W.D.

April 27, 1987.

Wesley E. Lindberg, Rockford, Ill., for Home Federal Sav. and Loan.

Kenneth F. Ritz, Rockford, Ill., for debtors.

## MEMORANDUM OPINION AND ORDER

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on the Motion of Home Federal Savings and Loan Association of Rockford (Home Federal) to Dismiss Debtors' Chapter 12 petition. Home Federal is represented by Attorney Wesley E. Lindberg. The M & I Bank of Beloit, who joins in Home Federal's Motion, is represented by Attorney William W. Rentz. The U.S. Trustee is represented by Attorney Larry Ramey. The Chapter 12 Standing Trustee is represented by Attorney Mary P. Gorman. The Debtors are represented by Attorney Kenneth F. Ritz.

This Memorandum Opinion and Order shall represent findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

The Debtors are involved in a horse breeding, training and showing operation. They own 14 acres of land upon which they have their principal residence and two buildings with horse stables; one of the stables contains a training arena. On this land, the Debtors raise 10 acres of alfalfa which they use as feed for the horses. The Debtors also rent approximately 27 acres, used as pasture for the horses.

The Debtors own none of the horses located on the property. They earn income in several ways. Mr. Lans, a third party who may be considered a partner in the Debtors' operation, provides the Debtors with mares owned by him. The Debtors breed the mares which results in colts. The colts are raised, trained and showed by the Debtors, then sold. Any excess money received above the costs of raising the colts is split equally between the Debtors and Mr. Lans. Mr. McKillips testified that the training and showing of colts increases their value.

Another way in which the Debtors earn money from the horses is, again, mares provided by Mr. Lans are bred, resulting in colts. The colts are sold soon after birth,

but kept by the Debtors for training and showing. The Debtors split the profit from each sale with Mr. Lans and charge the new owner of the colt a monthly boarding charge, which includes fees for training. There are additional fees if the Debtors show the colt.

A third income generating mechanism involves third persons bringing their horses to the Debtors for training. The Debtors charge a training fee, which includes feed and care, and additional fees for showing. The Debtors do not solely board any horses. When someone brings his horse to the Debtor, more is done with the horse than merely caring for it.

The final major income producing device involves breeding fees. The Debtors keep several stallions which, for a fee, they will use to breed third person's mares. The Debtors make minor amounts of income through the buying and selling of horses.

The Debtors' tax return for the taxable year 1985, the year prior to this Chapter 12 petition, shows gross income from the business, wages and other gains and losses of $168,388. See, *In re Etheridge*, 68 B.R. 235 (Bankr.C.D.Ill.1986). The return shows income from training and showing of horses of $132,550. Mr. McKillips listed his occupation as "horse trainer".

■ Section 101(17) of the Code provides, in pertinent part:

(17) "family farmer" means—

(A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 ... and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed.

11 U.S.C. Section 101(17). Section 101(20) provides:

(20) "farming operation" includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state.

11 U.S.C. Section 101(20). Section 109(f) provides:

(f) only a family farmer with regular annual income may be a debtor under Chapter 12 of this title.

11 U.S.C. Section 109(f).

The concept of "family farmer" is new to the Code with the advent of Chapter 12, Adjustments of Debts of a Family Farmer With Regular Annual Income. Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554, eff. Nov. 26, 1986. However the concept of "farmer," and "farming operation" have deep roots in American bankruptcy law. For an excellent discussion, see Anderson, J.C., AN ANALYSIS OF PENDING BILLS TO PROVIDE FAMILY FARM DEBTOR RELIEF UNDER THE BANKRUPTCY CODE, 132 Cong.Rec. S15076 (daily ed. Oct. 3, 1986). The concepts of "farmer" and "farming operation" have been litigated in relation to Section 303(a) of the Code, which prohibits filing an involuntary petition against a farmer; and Section 1112(c) of the Code, which prevents the conversion of a farm debtor's case from Chapter 11 to Chapter 7. The only difference between the definition of "family farmer" and "farmer" is the difference between the percentage of income earned from the "farming operation". (Note: the definition of "farmer" requires that 80% of the person's income result from farming operations, Section 101(19), while the definition of "family farmer" requires that 50% of the persons income result from farming operations.) Otherwise there is nothing in the Congressional history which would indicate that a different test is to be used. The Court, therefore, may look to cases decided under Sections 303(a) and 1112(c) in order to decide whether the Debtors are family farmers within the meaning of the Code.

Initially, the Court notes that what the Debtors do is not farming or ranching in the natural or traditional sense of those terms. Nor would most of what the Debtors do fall within the dictionary definition

of those terms. It is true the Debtors raise some crops, alfalfa. The entire crop, however, is insufficient to provide a substantial source of feed for the horses. Most of the feed used is purchased from the outside. The Debtors also raise horses, which are livestock. However, this activity is incidental to their main occupation, training and showing horses.

■ The Debtors' operation is essentially a service occupation, not the production of agricultural goods for consumption. Nevertheless, the Court will not confine itself to a natural or traditional, or even a dictionary definition of "farming operation". There may be other businesses which do not seem to fall within what is traditionally thought of as farming, i.e., a sod producer, but which very well may qualify for Chapter 12. It is the intent of Congress, as embodied in the Bankruptcy Code, which must control.

The Court finds two cases as particularly enlightening: *Armstrong v. Corn Belt Bank*, 55 B.R. 755 (C.D.Ill.1985) and *In re Dakota Lay'd Eggs*, 57 B.R. 648 (Bankr. D.N.D.1986).

In *Armstrong*, the court noted that the purpose for singling out farmers for special consideration is to "protect those whose major source of income is dependent upon sales of ordinary farm products, such products being subject to the ravages of climate and fluctuating farm prices." 55 B.R. at 760. See also, Anderson, 132 Cong. Rec. at S15076–77. Using this, the court excluded income earned from the sales of machinery and the rental of farm land from the computation of income resulting from farming operations. The court reasoned that none of the risks attendant with farming were present in these transactions.

The Debtor in *Dakota Lay'd Eggs* was involved in four types of money making activities:

1. The debtor owned three egg production facilities and the flocks of chickens in them. The debtor was responsible for all production, all costs of production and received all profits.

2. The debtor owned several flocks of hens which were placed with area farmers. The farmers, for a fixed fee, were responsible for the housing, care and feeding of the chickens. The debtor was responsible for providing feed and medicine for the flock and was also responsible for the processing of the eggs. The debtor received all profits from the sale of eggs.

3. The debtor purchased eggs from independent egg farmers. The hens and facilities were owned by the contracting farmers. Although the debtor provided feed and medicine, the farmer was paid on the basis of the number of eggs produced. The debtor then processed the eggs and sold them.

4. The debtor purchased eggs on the open market, processed and then sold the eggs.

The court concluded that "farming operation" included "those activities normally done by persons engaged in the initial stages of production." 57 B.R. at 653. The Court also looked to 7 U.S.C. Section 291, which protects farmers from anti-trust laws and defines them as "persons engaged in the production of agricultural products". The court found that activity 1 was a farming operation since the debtor was primarily involved in the production of eggs. Activity 2 was found to be a farming operation since the debtor owned the egg producing chickens. Activities 3 and 4 were found not to be farming operations since the debtor did not own the chickens, was not involved in the production of eggs, but merely purchased, processed and sold them.

■ Here, of the various aspects of the Debtors' business, only the breeding for purposes of horses to be sold, the raising of horses for sale, and the actual sale of the colts or horses constitute farming operations. Of all of the aspects of Debtors' business, only those activities constitute the production of an agricultural product. None of the other aspects of the Debtors' business is in the nature of a farming operation.

Raising a colt which belongs to another is not farming if the measure of compensa-

tion is a fee rather than a share of the profits at a future sale. In this situation, the Debtors' profit is not at the mercy of the weather or the farm economy. Their profits may be affected, but the effect is indirect. The risks normally attendent with a farming operation, including the contemporary phenomenon of falling land values, are just not present here. The same analysis may be applied to the training, showing, and other aspects of the Debtors' business. The Debtors are, for a fee, providing a service, not producing a farm product. Most of what the Debtors do just does not conform to what Congress deemed needed special protection.

In this case, Home Federal has carried its burden of going forward and legitimately placed in issue the Debtors' eligibility to file Chapter 12. Home Federal introduced evidence that the Debtors' 1985 tax return lists Mr. McKillips' occupation as "horse trainer". The tax return declares gross income of $168,388. Schedule F of the tax return shows that $132,550 (or 79%) arises under the category of Training and Showing. Mr. McKillips testified that the phrase "Training and Showing" was devised by his accountant as a catch-all category for the Debtors' horse selling, breeding, training and showing business. Therefore, includable in this category is the income earned from breeding, raising for sale, and selling horses. However, Mr. McKillips could not specify how much income was attributable to the different aspects of Debtors' business.

The Court concludes that the Debtors have failed to establish that 50% of their gross income for taxable year 1985 was attributable to farming operations.

Based on the foregoing, the Debtors' Chapter 12 case is DISMISSED.

IT IS SO ORDERED.