**In re Jerry P. CLUCK, SSN 457–64–9018, Carol A. Cluck, SSN 456–48–9650, Debtors.**

**Bankruptcy No. 88–00396.**

United States Bankruptcy Court, E.D. Oklahoma.

Jan. 12, 1989.

David Nixon, for debtors.

Robert Inglish, Okmulgee, Okl., for Pollard and Sequoyah.

Doneen Douglas Jones, Oklahoma City, Okl., for Memphis.

Margaret Welch, a creditor, pro se.

Robert Hemphill, Chapter 12 Trustee.

A. Camp Bonds, Jr., Muskogee, Okl., for trustee.

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On November 30, 1988, this Court conducted a confirmation hearing with regard to the Debtors' Chapter 12 Plan of Reorganization which was filed on November 1, 1988. Objections to the Plan were entered by First Bank & Trust of Memphis, Texas (Memphis), Pollard & Company (Pollard), Sequoyah State Bank of Muldrow, Oklahoma (Sequoyah) and Margaret Welch.

Also coming on for consideration were the following:

    (a) Motion to Dismiss by Pollard with Response by the Debtors;

    (b) Motion to Dismiss by Sequoyah with Response by the Debtors;

    (c) Motion to Dismiss by Memphis with Objection by the Debtors;

    (d) Motion to Modify Stay or in the Alternative for Adequate Protection by Pollard with Response by the Debtors.

After review of the evidence presented at the hearing, the arguments of counsel and the pleadings filed in the case, this Court FINDS:

### FINDINGS OF FACT

1. This is a "core" proceeding thereby conferring jurisdiction to this Court pursuant to 28 U.S.C. § 157(b). This is a final Order for the purposes of Bankruptcy Rule 7052 and Rule 52, Federal Rules of Civil Procedure.

2. The business which the Debtors seek to reorganize is a horse breeding, training and boarding operation, with a facility located in Muldrow, Oklahoma. The Debtors rely on two stallions for the breeding portion of their business; namely, Impressive Bar Leo and Impressive Ben.

3. The Debtors have been operating from this facility for the last eight years. An examination of creditor's exhibit #1, Income Tax Review–Schedule F, reveals the following net farm income (i.e., total gross income less total gross expenses) for the years of operation 1980 through 1987:

1980 = ($ 25,710.00)
1981 = ($ 88.00)
1982 = ($104,793.00)
1983 = ($250,438.00)
1984 = ($175,576.00)
1985 = ($260,297.00)
1986 = ($146,922.00)
1987 = ($129,893.00)

4. Debtor, Jerry Cluck, testified that problems began in the operation of his business when he was convinced to syndicate the stallion known as Impressive Bar Leo, selling shares to individual investors. The costs associated with the syndication of the horse, as well as the nonpayment on the shares that were sold created cash flow problems for the business. In addition, high interest rates on secured loans from creditors also created an atmosphere in which it was difficult to operate efficiently. However, Mr. Cluck further testified that he made no effort to collect payment from some 24 of 39 parties to whom syndicate shares had been sold, valued at approximately $20,000 per share. The reason given for this inaction was that creditors such as Memphis to whom payment was owed and delinquent were threatening the Debtor by some unexplained means thereby creating a "cloud" under which the Debtor was operating. Since he did not wish to involve any other persons in this predicament, he did not seek to collect on these accounts receivable.

This Court is without sufficient facts to determine whether the delinquent syndication payments are even enforceable now.

5. Mr. Cluck also testified that prospective clients did in fact bring their mares to be bred at the Debtors' operation with Impressive Bar Leo or Impressive Ben. However, they were turned away thus refusing business. The Debtor's explanation for this was again that he did not wish to involve any other party in any of his financial troubles.

6. The Debtors sought relief under Chapter 11 of the United States Bankruptcy Code on April 15, 1988.

7. The Debtors' post-Petition operation of the facility has resulted in the following accounting:

April, 1988—$1,497.21 profit; $95 unpaid administrative expenses

May, 1988—$1,426.61 profit; $710 unpaid administrative expenses

June, 1988—$649.49 loss; $2,079.65 unpaid administrative expenses

July, 1988—$1,857.95 profit; $2,262.46 unpaid administrative expenses

August, 1988—$918.19 loss; $2,265.07 unpaid administrative expenses

No reports for the months of September, October, November and December, 1988 have been received by this Court. The Debtor has not solicited new business nor has he expanded on his clientele in any way while under the protection of the United States Bankruptcy Code.

8. The Debtors' Plan contemplates income derived from several sources which were explained extensively through testimony by the Debtor at trial. Many of these new sources of income have never been attempted by the Debtors before or have only been a small portion of the Debtors' total operation. These new sources include the buying and raising of cattle to be accomplished by Mrs. Cluck's brother about whose qualifications this Court has no knowledge since no evidence was offered on this point. Also included in the Debtors' anticipated business is a variety of uses of the two primary stallions to derive income from breeding and the receipt of mares in lieu of breeding fees. However, testimony was offered by the creditors to refute the ability of the Debtors to derive sufficient income from these new endeavors to fund the Debtors' proposed Plan.

9. At the confirmation hearing, evidence was offered in the form of testimony from experts called by each side to substantiate the likelihood of success of the Debtors' proposed operation under the Plan of Reorganization. The experts seemed to agree that the success of a horse breeding operation depends largely on the demand for the particular breeding stallions, the reputation of the breeder and the competitive climate of the horse industry in general. In this regard, testimony revealed that the demand for breeding with the two stal-

lions owned by the Debtors has steadily declined over the past eight years of operation. Further, the economic climate in the horse industry has not been favorable and has likewise been steadily declining. The reputation in the industry of the Debtor as a horse breeder was generally demonstrated as favorable, although little evidence was offered on this point. However, the reputation of the Debtor may be greatly affected by the practice of turning away prospective business.

10. The Debtors' Plan offers a projection for the year 1989 only and states projected income of $284,115 and projected operating expenses of $205,222 for a net income from operations of $78,893. After deducting living expenses of $12,420 and $4,000 for payment of Federal and state income taxes, a total of $62,473 will allegedly be available for payment to creditors.

## CONCLUSIONS OF LAW

■ A. A Chapter 12 Plan is confirmable upon the establishing of feasibility and the dedication of all disposable income to making Plan payments. Disposable income is the remainder of gross income following deductions for reasonable living expenses and reasonable operating expenses. Every indication demonstrates that the Debtors are indeed applying all disposable income toward payment of creditors under the proposed Plan of Reorganization.

■ A feasibility determination requires that the projected income and expense figures are achievable in light of past operations, present ability and anticipated future conditions in the particular market in which the debtor is involved. The Bankruptcy Code at 11 U.S.C. § 1225(a)(6) requires this Court to determine that "the debtor will be able to make all payments under the Plan and to comply with the Plan." In order to accomplish this mandate, this Court traditionally examines the debtor's business performance on two fronts: one, pre-Petition, wherein the history of the debtor is evaluated at its peaks and its valleys during operation; and two, post-Petition, wherein attempts at recovery are made after the debtor is afforded the protection of the U.S. Bankruptcy Code. These are the only sources for concrete information of the debtor's past, present and future abilities to succeed in consideration of economic conditions.

In both instances, the Debtors have failed to demonstrate an ability to make the necessary profits for Plan implementation. At times, special circumstances may exist to create exceptions that explain the frustration of a debtor to achieve viability in a business venture. However, in the case before this Court, the Debtors, for all intents and purposes, voluntarily ceased operation by turning away prospective clients citing a desire to keep these clients from getting involved in the Debtors' financial woes. No evidence, however, was presented at trial that demonstrated that the creditors had taken concrete, adverse actions against the Debtors to frustrate the business. A vague implication of a "cloud" is not sufficient to convince this Court that a special circumstance existed.

In addition, the Debtors failed to collect on nearly $500,000 in outstanding accounts receivable from syndicate shareholders when revenue was desperately needed for the continued operation of the Debtors' business. These imprudent actions are simply not reasonable in the evaluation of the Debtors' ability to perform based on pre-Petition operations.

Although the protection of prospective clients is admirable, most were from out of state and would have had no knowledge of the trouble that the Debtors were experiencing. As the expert for the creditors stated at the confirmation hearing, if he were trying to survive and do business, he would not let the fact that he was experiencing trouble with his creditors stop him from doing business and trying to work out of his problems.

The Debtors were engaged in somewhat of a paradox wherein they were refusing business, thus cutting off the life blood revenue necessary to pay creditors due to the fact that their creditors were demanding payment. Their reaction to the situation simply does not show good business acumen.

The changes that the Debtors propose to employ in light of the history of losses incurred since the inception of the business and the past actions of the Debtors do not demonstrate feasibility.

Post–Petition, the Debtors have offered no evidence that any improvements in the operation were attempted while under the protective shield of the U.S. Bankruptcy Code and this Court. None of the projected changes in operation were attempted in order to convince this Court of the Debtors' ability and willingness to successfully proceed with the operation. This failure to begin a recovery as soon as practicable does not speak well of the Debtors' ability to proceed with this admittedly tenuous Plan.

■ B. The question has also been raised as to the Debtors' eligibility to file for Chapter 12 relief as a family farmer. Under the Bankruptcy Code, a "farming operation" includes "farming, tillage of the soil, dairy farming, ranching, production and raising of crops, poultry or livestock and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(20). Courts have recognized that the definition of a farming operation "does not provide an all inclusive list of tasks and activities" and is therefore not limited to those operations specifically enumerated. *In the matter of Bernard Armstrong*, 812 F.2d 1024, 1026 (7th Cir.1987). However, the Courts have also warned against broadly interpreting the statute so as to eliminate the definition altogether by "bringing in operations clearly outside the nature or practices one normally associates with farming." *In re Dakota Lay'd Eggs*, 57 B.R. 648, 653 (Bankr.D.N.D.1986). A "family farmer" is defined in the Bankruptcy Code as an "individual and spouse engaged in a farming operation ..." 11 U.S.C. § 101(17).

C. Several tests have been established to determine if a debtor is a family farmer as intended by the Congress in the formulation of the Chapter 12 scenario. In the case of *Federal Land Bank of Columbia v. McNeal*, 16 Bankr.Ct.Dec. (CRR) 673, 77

B.R. 315 (Bankr.S.D.Ga.1987), the Court set forth two such tests, to-wit:

(1) Is it a typical farming activity and, if so, whose farming activity is it—the debtor's or someone else's?

Under this test, it is arguable whether this is actually a typical farming activity. However, the operation is primarily for the purpose of offering a service to others rather than serving as a self-contained farming operation. The fact that the Debtors accept mares in exchange for such services and also grow some of the feed used in the operation is insufficient to establish a farming operation under this test.

(2) Is the activity subject to the inherent risks of farming, such as being subject to drought or other temporary, uncontrollable circumstances of farming?

Although the Debtor offered some evidence of the cyclical nature of the breeding of horses, it would seem for the most part the Debtors' operation is only minutely affected by the typically devastating effect of weather and other uncontrollable conditions.

Under this criteria, it would appear that the Debtors again do not meet the requirements of eligibility for family farmer under Chapter 12.

D. The Debtors have directed this Court to several cases which purportedly demonstrate eligibility for a horse breeding operation. Most of these cases either intertwine the horse breeding operation with some other recognized and established farming activity or simply do not support the Debtors' position. [e.g., *In re Wolline*, 74 B.R. 208 (Bankr.E.D.Wisc.1987), wherein the debtor raised horses for his own use and had cattle for a dairy operation; and *In re McKillips*, 72 B.R. 565 (Bankr.N.D. Ill.1987) wherein only a breeding operation for the purpose of selling the horses is considered a farming operation]. In the instant case, the Debtors solely engage in a breeding, training and boarding operation, with the Debtors owning only a very few of the horses involved in the operation. As such, Debtors' eligibility fails on the grounds stated above.

IT IS THEREFORE ORDERED that the confirmation of the Debtors' Chapter 12 Plan of Reorganization is hereby denied on multiple grounds of insufficient demonstration of feasibility and ineligibility of the Debtors as family farmers.

IT IS FURTHER ORDERED that the Debtors be given the opportunity to convert to a Chapter 7 within fifteen (15) days after the entry of this Order. If at the end of that time period conversion has not been accomplished by the Debtors, this Chapter 12 case shall be dismissed.

FURTHER, Pollard's Motion to Modify Stay or in the Alternative for Adequate Protection is rendered moot by this Court's action.