**In re SHOWTIME FARMS, INC., Debtor.**

**No. 99–41630.**

United States Bankruptcy Court, E.D. Texas, Sherman Division.

Oct. 17, 2000.

H. DeWayne Hale, Baker & McKenzie, Dallas, TX, for Debtor.

Janna L. Countryman, Plano, TX, trustee.

## MEMORANDUM OPINION

DONALD R. SHARP, Chief Judge.

Now before the Court for consideration is the confirmation of Debtor's First

Amended Chapter 12 Plan. Showtime Farms, Inc. is a Texas Corporation. One-hundred percent of the stock is owned by Dayle Haunert. The evidence showed that the stock was owned by her prior to her marriage to Paul Haunert from whom she was in the process of obtaining a divorce at the time of this confirmation hearing. The matter came on for hearing pursuant to regular setting when all parties were present in Court with their respective counsel and the Court took evidence and argument. This opinion constitutes the Court's findings of facts and conclusions of law as required by Federal Rule of Bankruptcy 7052 and disposes of all confirmation issues presented to the Court.

The Plan presented for confirmation was an amended Plan which had been amended in an effort to satisfy objections made to the original plan of reorganization filed in this Chapter 12 proceeding. The bulk of the objections were satisfied and at confirmation hearing, there were only two remaining objecting creditors: Dr. David Saunders and Paul Haunert, the estranged spouse of Dayle Haunert. Mr. Haunert's objections centered around his contention that the stock in Showtime Farms, Inc. should not be considered the separate property of Dayle Haunert but he offered no evidence to rebut Mrs. Haunert's evidence demonstrating that she was the owner of one-hundred percent of the stock in Showtime Farms prior to her marriage to Paul Haunert. In any event, that issue is not determinative of whether this Chapter 12 Plan should be confirmed since the evidence is clear that Mrs. Haunert is the one-hundred percent record owner of all shares of stock and is the sole operator of the business. Mr. Haunert's other objections are simply a "me too" of Dr. Saunders objections concerning feasibility and best interest of creditors. The only other appearance at the confirmation hearing was by the Chapter 12 Trustee who recom-mended confirmation of the Plan in a written report.

█ Showtime Farms, Inc. owns real property located in a rural area of Denton and Tarrant Counties. The improvements consist of a house and barn with customary fencing and other small out-buildings. Dayle Haunert lives in the house on the property and operates her business from the barn. The Debtor owns various farm equipment including a tractor, horse trailer, farm trucks and other related farm implements necessary to maintain pasture land and discharge farm chores. Dayle Haunert explained Debtor's business as raising horses for resale, boarding horses, training horses, renting horses and giving riding lessons to the general public. The Debtor maintains a pasture for the horses owned by Debtor and by others that are boarded on the premises. The Debtor raises Bermuda grass on a portion of the property but most of the hay and feed for the animals is purchased. The property is insured under a farm policy and has an agricultural exemption for state tax purposes. The Court concludes from all of the testimony that the real property owned by the Debtor contains traditional farm facilities and Debtor conducts traditional farming operations. The Debtor's operations are subject to the inherent risk of any farming operation including fluctuating market prices, feed prices, uncertain weather and risk to livestock from disease and injury. The Court must overrule Saunders argument that the Debtor is not eligible for Chapter 12 relief because it is not a traditional farm. *See In re Sugar Pine Ranch*, 100 B.R. 28 (Bkrtcy.D.Or. 1989) and *In re McKillips*, 72 B.R. 565 (Bkrtcy.N.D.Ill.1987)

Debtor's testimony and exhibits, consisting primarily of the monthly reports prepared, show that the farm has been oper-

ating at a small profit since shortly after the bankruptcy petition was filed. The testimony indicated that the farm appeared to be doing quite well until discord developed between Dayle Haunert, on the one hand, and David Saunders and Paul Haunert, on the other hand. The relationship of these parties goes back quite some time and David Saunders was instrumental in the formation of Showtime Farms in that he financed the improvements on the raw land. Testimony indicated that he had advanced as much as one-half of a million dollars to Dayle Haunert for the development of Showtime Farms and that he maintains a first lien deed of trust on the property. At one time, Saunders boarded a large group of horses on the premises. Although the reasons were not clearly explained in the testimony, it was clear that the trouble began when Saunders removed his horses from the premises and took them to another location with Paul Haunert joining him to care for the training and development of the horses. This incident caused an immediate cash flow crunch and precipitated this bankruptcy. It was obvious at the hearing that there is much animosity between Paul Haunert and David Saunders on the one hand and Dayle Haunert on the other. Saunders simply wants the right to foreclose on his security interest and take the property. Paul Haunert's motives are not clear but the animosity attendant upon this failed personal relationship is not at all an unusual occurrence in bankruptcy court.

The testimony at the hearing indicated that the real property owned by Debtor was worth approximately $600,000.00. The balance on the first lien to Saunders is $331,000.00 plus accrued interest and attorney fees. The only objections of Saunders which have merit and deserve consideration are that the Plan is not feasible and that he is not being treated fairly in that he is not being paid the equivalent value of his claim over the life of the Plan. Saunders also objected that the Plan did not meet the best interests of creditors' test as to all of the unsecured creditors who are being paid one-hundred percent of their debt over the life of the Plan. The Court concludes that Saunders has no standing to advance those objections since those creditors are satisfied with their treatment under the Plan. The only real objections to confirmation of this Plan are Saunder's objections as to feasibility and his treatment under class 3 of the Plan.

The Saunders' note, secured by a deed of trust lien on the real property and a security interest in personal property is amortized over nine years with interest at the rate of ten percent per annum. The note matures by its terms on December 1, 2007, and the monthly payments are $4,819.99. Under the Debtor's proposed Plan, the Debtor would retain the property and modify the terms of Saunder's debt. The Plan provides that Saunder's debt will be amortized at a 30 year amortization rate but with a ten year balloon payment so that the entire principal will be paid off at the end of ten years. The Plan also modifies the interest rate from the ten percent contract rate to one percent above the prime rate set by Bank of America on the date of the confirmation hearing with an adjustment on November 1 of each calendar year thereafter to one percent above the prime rate set by Bank of America on November 1. Testimony indicated that the prime rate set by Bank of America on confirmation day was 8.25 percent so that the rate under the plan for the first year would be 9.25 percent. There is no hope that Debtor would accrue sufficient earnings during the ten year period to pay the balloon note when it becomes due but would instead be relegated to either refinancing the property or selling the property to pay the note in full. The Plan also

provides that Saunders will retain his lien interest and in the event of default under the Plan, he will simply be able to foreclose on his security. Saunders objects that this provision of the Plan does not comply with 11 U.S.C. § 1225(a)(5) in that the distribution to him under the Plan is less than the allowed amount of his claim.

 Saunders' other objection is that the Plan is simply not feasible. To establish his contention, he offered the testimony of David Epperson, a CPA, who had analyzed the Debtor's operation and concluded that it simply did not have the earnings that would allow it to pay the payments required under the Plan. Epperson's testimony was convincing except for one thing. He based his entire calculation on an erroneous set of circumstances. Epperson's entire analysis of the projected cash flow was based on a consistent boarding population of no more than 19 horses. Debtor's testimony was clear that at the time of confirmation there were 31 horses on the premises and that the number of horses being boarded had steadily risen since Saunders had removed his horses and precipitated the problem leading to the filing of the bankruptcy petition. Although the number of horses that remain at the facility and produce revenue is not a sure thing, the evidence was clear that Debtor could expect in excess of 19 horses unless there was a drastic downturn in business. There was no evidence presented to indicate that such a downturn was imminent or that Debtor was not able to properly operate her business in such a manner as to continue the level that existed at confirmation hearing. Any projection into the future is obviously somewhat speculative but Epperson offered no testimony at all that would support a belief that the number of horses at the facility would decline to what it was shortly after Saunders removed his horses just prior to the bankruptcy filing. Although Saunders concentrated on the feasibility argument, the Court finds that his evidence is far from persuasive that this is a doomed business which simply cannot support the Plan proposed. To the contrary, the monthly reports placed into evidence and the testimony of Dayle Haunert paints a very believable picture of a business that has made and continues to make an excellent recovery from a precipitous decline caused by a principal client removing his horses from the premises. Based on the cash flow occurring at the time of confirmation and assuming that that simply continues with no increase in business, this Debtor will be able to perform under its plan. The Court finds the discussion in *Matter of T-H New Orleans Limited Partnership*, 116 F.3d 790 at page 802 (5th Cir.1997) very instructive on the matter of feasibility in connection with this Plan. The Court found that the Plan in that case included several alternatives, any one of which would make the Plan feasible. Included in those alternatives was a provision for refinancing a balloon note, or selling the property or simply returning the property to the Creditor in satisfaction of the debt. In this case, the Debtor is obviously banking on improved values over the life of this Plan so that refinancing or sale will be a viable alternative. If these options are not available, the Plan provides that the Creditor maintains his security interest and will be able to foreclose in the event of default. Based on the evidence presented, and considering the value of the property as opposed to the amount of the debt, it is obvious that this Creditor will be made whole under any of the various possible scenarios. As the Court pointed out in the *T-H New Orleans Limited Partnership* case, the Plan is feasible if it offers a reasonable probability of success. Certainly this Plan meets that standard. The

objection as to feasibility must be overruled.

The Court has much more problem with the objection centered on 11 U.S.C. § 1225. Saunders argues that the modification of the terms of the note to him are impermissible and that he will not receive a value equivalent to the allowed amount of his claim. There are two elements to his argument, one is that the restructuring of the amortization period with the balloon note decreases the value that he receives and the other is that the interest rate is inadequate.

The Court concludes that the restructuring of the amortization period is not fatal to this Plan. The Code clearly provides in 11 U.S.C. § 1222(b)(2) that the Plan may modify the rights of holders of secured claims. The treatment of Saunder's debt in this Plan is clearly a modification by the Plan and the question is whether or not the Plan complies with 11 U.S.C. § 1225(a)(5)(B)(ii) which requires the value of property to be distributed under the Plan on account of the claim be not less than the allowed amount of the claim. Of course, the determination of whether the deferred payments under the Plan are equal to the value of the claim on the effective date of the Plan is simply a function of whether or not adequate interest is being paid in addition to the principal debt.

The question of the proper rate of interest to be paid in bankruptcy cases has been a matter of much litigation and discussion over the years. There have been various theories espoused and there is certainly not uniformity across the nation and among the circuits in the exact approach to calculating the interest rate. In the Colliers Bankruptcy treatise, the issue is summarized by concluding that the cases are fairly uniform in agreeing that a market rate of interest is appropriate but the approach to determining the market rate is drastically different. Some courts have discussed what has been called the "coerced loan" theory which holds that the creditor is being forced into making a loan and should be compensated at the rate he would receive for a similar loan on the open market. Other courts have rejected this theory and opted for some sort of risk free index rate such as federal funds rate, prime rate or some sort of extended federal obligation rate and then added a risk factor based on the circumstances of the case. This Court followed that theory in an earlier opinion written in 1994. *In re Collins*, 167 B.R. 842 (Bkrtcy.E.D.Tex. 1994). That was in a Chapter 13 proceeding. At that time, the Fifth Circuit had not established a formula for determining the appropriate cram down rate of interest in Chapter 13 plans or in Chapter 12 plans. Indeed, to this date, the Fifth Circuit has not definitively established a formula for the lower courts to use. The Court has clearly established that market rate in Chapter 11 confirmations is the appropriate rate and in *In re T-H New Orleans Limited Partnership*, 116 F.3d 790 (5th Cir.1997) the Fifth Circuit affirmed the adoption of the contract rate as the appropriate cram down interest rate but did not specifically require that rate to be used.

The Fifth Circuit has now given clearer guidance in Chapter 13 proceedings *In the Matter of Smithwick*, 121 F.3d 211 (5th Cir.1997) where the Court aligned itself with the Third Circuit approach reflected in *General Motors Acceptance Corporation vs Jones*, 999 F.2d 63 (3rd Cir.1993) and established not only that the market rate was the appropriate interest rate but established a procedure for arriving at that rate in most cases. The *Smithwick* opinion provides that there is a rebuttable presumption that the contract rate on the loan is the appropriate rate to use in a cram down situation. Either the creditor

can come forward with persuasive evidence that its current rate is in excess of the contract rate, or the Debtor could come forth with persuasive evidence that the current rate is less than the contract rate. The Court found that this approach balances the competing considerations of judicial economy in the typical Chapter 13 case while insuring that the cost and risk associated with the forced extension of credit in the Chapter 13 plan would be properly recognized.[1]

■ The market rate approach is firmly established as the proper rate of interest in Chapter 11 and Chapter 13 cases. The Fifth Circuit has not had the occasion to definitively rule in a Chapter 12 proceeding. This Court can find no reason to think that the result would be any different in a Chapter 12 case than in the Chapter 13 proceeding the Court was considering in *Smithwick*. The statutory language contained in 11 U.S.C. § 1325(a) is virtually identical to the language contained in § 1225. In pertinent part, the language in § 1225 dealing with Chapter 12 cases provides that the plan can be confirmed if "the value, as of the effective date of the plan, of property to be distributed *by the trustee or the debtor* under the plan on account of such claim is not less than the allowed amount of such claim..." The statutory language in § 1325 that the Court was considering in *Smithwick* is the same except that the phrase "by the trustee or the debtor" is deleted and the language "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim..." It seems apparent that congressional intent as to the treatment of claims under both Chapter 13 plans and Chapter 12 plans is identical except for the person who may make the distribution. The other consideration referred to in the *Smithwick* case also mitigates in favor of adopting the same principle in Chapter 12 proceedings. The Court recognized that the type of expert testimony presented in complex Chapter 11 cases is not practical in the typical Chapter 13 proceeding. Those same considerations hold true when one compares Chapter 12 proceedings to complex Chapter 11 proceedings. Therefore, this Court concludes that the proper method for determining the correct rate of interest in a Chapter 12 cram down proceeding is identical to that outlined by the Fifth Circuit in connection with the Chapter 13 proceedings.

■ In this case, there was no evidence presented to the Court concerning current market rates on agricultural loans of this type. Certainly, there was no evidence concerning Dr. Saunders' current market rate since this is not a usual and customary business engaged in by him. There was simply no evidence concerning appropriate rates of interest presented by either party. Dr. Saunders simply objected that he was not getting appropriate treatment and this Court must agree. If one applies the rebuttable presumption theory, then he is entitled to receive the ten percent contract rate of interest on his loan under this confirmed plan.

■ Dr. Saunders also objected to the confirmation on the basis that his security instrument requires that Debtor maintain an insurance policy with a two million dollar liability limit. The evidence estab-

1. For a comprehensive analysis of the *Smithwick* holding and the cases leading up to that holding, *See In re Richard,* 241 B.R. 403 (Bkrtcy.E.D.Tex.1999) *which envisions possible problems and voices certain concerns with* *the application of the rebuttable presumption to Chapter 13 cases. Regardless of any apprehension concerning the practical effects of this case, it is now clear law and clear guidance in the Fifth Circuit, at least in Chapter 13 cases.*

lished that the policy in question provided a three hundred thousand dollar limit of liability and insured the improvements on the property for their cash value. The evidence also established that at no point from the inception of this loan has there been a two million dollar liability policy in effect and that until the controversy arose in this case, no objection to that situation had ever been voiced by Dr. Saunders. Dr. Saunders could not articulate at the hearing any insurable interest that he may have in requiring such a large limit of liability insurance. He has no ownership or managerial relationship to the operation on the premises and therefore has no reason to need liability insurance protection. The evidence clearly established that his security interest is adequately insured and it was clear that he had no interest in the two million dollar liability insurance limit as long as his relationship with the Debtor was satisfactory. To the extent that Dr. Saunders ever had the right to require such a high limit of liability insurance, this Court holds that he has waived that right by his actions over the years that he made no objection to the lower and satisfactory limits.

The Court concludes that this Plan would be confirmable but for the failure of the Plan to provide a contract rate of interest on Dr. Saunders' loan. Since this would be a very minor adjustment in the overall scheme of this reorganization and would have no adverse impact on the feasibility analysis, the Court finds that it is appropriate to allow the Debtor an opportunity to amend the Plan and provide a correct rate of interest to secure confirmation. Accordingly, Debtor is given 20 days from the date of entry of this opinion to file appropriate documents amending the Plan to pay Dr. Saunders a ten percent rate of interest and submit an order of confirmation in accordance therewith. If no amendment is filed and no order of confirmation supplied within 20 days, then this Court will enter an order denying confirmation of the Plan.